UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. 11-50094-JLV |
| | ) | |
| Plaintiff, | ) | ORDER DENYING |
| | ) | DEFENDANT'S FIRST |
| vs. | ) | MOTION TO DISMISS |
| | ) | INDICTMENT |
| JAIME MUNOZ-JURADO, | ) | **(REDACTED)** |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

On September 7, 2011, the government indicted defendant Jaime

Munoz-Jurado on one count of illegal reentry after deportation, in violation of

8 U.S.C. § 1326(a). (Docket 1). On October 26, 2011, Mr. Munoz-Jurado filed

a motion to dismiss the indictment, collaterally attacking the deportation order

underlying the offense. (Docket 18). The government resisted the motion.

(Docket 30). The court held an evidentiary hearing on January 24, 2012.[1]

(Docket 61). For the reasons set forth below, the court denies Mr. Munoz-

Jurado's motion in its entirety. In reaching this decision, the court thoroughly

---

[1]The government appeared at the hearing through Assistant United
States Attorney Heather Thompson. Mr. Munoz-Jurado appeared in person
and through his counsel, Assistant Federal Public Defender George Grassby.
A telephonic interpreter assisted Mr. Munoz-Jurado throughout the hearing.
During the hearing, the court received exhibits nos. 1-22 & 101-125, see
Docket 62, and the testimony of Mr. Munoz-Jurado, his wife Maria Milagros
Hernandez-Garcia, and Special Agent Lyle Brabazon of Immigration Customs
Enforcement ("ICE").

reviewed the record in this case, including the parties' submissions (Dockets

18, 19, 30, 67, & 69), the evidence received during the evidentiary hearing,

Mr. Munoz-Jurado's complete immigration or "A" file provided by the

government upon the court's request (Dockets 48 & 53), and a compact disc[2]

submitted by the government following the evidentiary hearing.

## FACTS

The court limits its recitation to those facts necessary to resolve the

pending motion. The court adduces the following facts from the record in this

case. If needed, the court may present additional facts in its discussion of the

merits of the motion.

Mr. Munoz-Jurado is a Mexican citizen and national who first entered

the United States in 1990. (Exhibit 5 at p. 2).[3] Immigration authorities did not

have contact with Mr. Munoz-Jurado until 2005. (HT 61:1-3).[4] On May 15,

2005, the La Familia cartel in Mexico kidnaped, attacked, and raped

---

[2]The compact disc contains an audio-recording of the September 24, 2009, *in absentia* hearing held by the immigration court. At the evidentiary hearing, the parties stipulated to the foundation of the audio-recording.

[3]Exhibit 5 is identical to Exhibit 116.

[4]The court shall refer to the transcript of the evidentiary hearing as "HT" followed by the page number(s) and line number(s) where the cited information may be found. For example the citation "HT 5:23-25; 6:1-2 " refers to information found on page 5, lines 23-25, and page 6, lines 1-2.

Mr. Munoz-Jurado's mother,[5] who died shortly thereafter on June 1, 2005.

(HT 3:25; 4:1-8; 39:7-15). At the time, Mr. Munoz-Jurado lived in Keystone,

South Dakota. (HT 4:9-10; Exhibit 2 at p. 2).[6] Upon hearing of his mother's

attack, Mr. Munoz-Jurado traveled to Mexico at the end of May of 2005 and,

after his mother's funeral, attempted to return to the United States on June 15,

2005. (HT 4:10-17). When Mr. Munoz-Jurado attempted to do so, immigration

authorities briefly detained him and told him to return to Mexico. (HT 5:1-11;

Exhibit 1). Mr. Munoz-Jurado complied and returned to Mexico by crossing

the United States-Mexico border. (HT 5:10-11). This act constituted a

"voluntary return."[7] (HT 5:13-18). Immediately after returning to Mexico,

Mr. Munoz-Jurado re-crossed the border and entered the United States on

June 15, 2005. (HT 5:10-12; 6:3-5).

Mr. Munoz-Jurado returned to Keystone, South Dakota, where he lived

with Ms. Hernandez-Garcia and their children. (HT 8:2-3). At some point, the

Pennington County Sheriff's Office had "a contact" with Mr. Munoz-Jurado.

---

[5]The Mexican cartel kidnaped Mr. Munoz-Jurado's mother to extort money from her family. (HT 39:12-13). When the family was unable to pay, the cartel attacked and raped her. (HT 39:13-15).

[6]Exhibit 2 is identical to Exhibit 109.

[7]A voluntary return is "a voluntary process at the border that is at the discretion of the border official . . . . The voluntary return is allowable numerous times. In fact, border parole [sic] agents do voluntarily return defendants numerous times on the border." (HT 7:3-9; 84:17-22).

(HT 62:5-7).  Mr. Munoz-Jurado provided his name, social security number, and address.  (HT 62:7-8).  The sheriff's office relayed the information to the Rapid City ICE office, which checked the social security number given by Mr. Munoz-Jurado.  (HT 62:5-8).  The social security number did not belong to Mr. Munoz-Jurado, a fact which concerned ICE.  (HT 62:8-11).

In June of 2009, ICE mailed a "G-56 call-in letter" to Mr. Munoz-Jurado at █████████████, Keystone, South Dakota.[8]  (HT 8:5-7; 29:9-12; 62:12-14).  A G-56 letter is an "appointment letter" sent to an individual with questionable immigration status.  (HT 61:10-13).  The letter advises the recipient to go to a designated ICE office to discuss his or her immigration status.  (HT 61:12-14).

The G-56 letter sent to Mr. Munoz-Jurado was held at the Keystone post office.  (HT 29:9-12).  Ms. Hernandez-Garcia went to the post office to retrieve and sign for the letter.  (HT 29:13-15).  The envelope did not list a P.O. Box number.  (HT 37:12-14).  Staff at the post office informed her they could not receive mail unless the mail identified the addressee's P.O. Box number.  (HT 29:18-19).  Staff informed her this was the last time they would accept a letter without an identified P.O. Box number.  (HT 29:15-17).  Ms. Hernandez-Garcia

---

[8]ICE obtained Mr. Munoz-Jurado's address from the information he provided to the Pennington County Sheriff's Office.  (HT 62:16-18).

informed Mr. Munoz-Jurado of the post office's policy and told him to advise

immigration authorities of their P.O. Box number.  (HT 29:20-21).

On June 17, 2009, as directed by the G-56 letter, Mr. Munoz-Jurado

reported to the Rapid City ICE office for his appointment with Agent Brabazon.[9]

(Exhibit 2 at p. 2).  Agent Brabazon interviewed Mr. Munoz-Jurado, verified his

status as an illegal alien, and collected information for the preparation of an

I-213 form, "Report of Deportable/Inadmissable Alien."[10]  (HT 64:14-24; Exhibit

---

[9]Agent Brabazon is a supervisory immigration enforcement agent and had been an agent for eleven to twelve years as of 2009.  (HT 60:3; 81:12-14).

[10]An agent produces an I-213 form after interviewing an individual.  (HT 72:15-17).  Agent Brabazon or another supervisor is always present at an I-213 interview.  (HT 68:8-10).  Agent Brabazon attended a 15-week intensive Spanish language training program offered by the Federal Law Enforcement Training Center.  (HT 68:11-15).  The program is equivalent to six college credits.  (HT 68:15-16).  ICE and border patrol agents undergo this training. (HT 68:17-19).  Agent Brabazon is not fluent in the Spanish language, but is "satisfactory."  (HT 68:20-25).  As Agent Brabazon explained:

> I can hold conversations.  I understand probably better than I speak. As long as I can -- I will ask them to speak slower if they say something too fast.  I have a general knowledge of Spanish, but I am not an expert in it.

(HT 69:1-4).  Agent Brabazon also explained he took the following precautions to ensure the interviewee understood his questions:

> I will ask the question in numerous different ways.  I will ask them if they understand what I am asking them; and then when they give me their answer, I will repeat the answer to them and ask them if that is what their answer to my question was; if I had it correct.

(HT 69:7-12).  However, Mr. Munoz-Jurado testified Agent Brabazon did not speak much Spanish.  (HT 41:25; 42:1-2).

2).  Agent Brabazon remembered interviewing Mr. Munoz-Jurado.  (HT 70:10-11).  The interview took place in both Spanish and English.  (HT 12-14).  Mr. Munoz-Jurado primarily spoke Spanish.  Agent Brabazon took the following precautions to ensure Mr. Munoz-Jurado understood the interview:

> A.    There were some parts that I would ask him in English and ask him if he understood.  Then he would reply if he did or not.  90 percent of the time he did not.  Then I would ask him in Spanish and ask him if he understand [sic] my question.  Or if he answered my question before I asked him if he understood it and I knew he understood my question.  And then I would repeat his answer to him and ask him if that was correct, if I understood it correctly, to verify.
>
> Q.    When you repeated his answer to him, was that in Spanish or English?
>
> A.    Spanish.
>
> Q.    When you asked him if he understood, was that in Spanish or English?
>
> A.    Spanish.
>
> Q.    Did you ask him if he understood at each point in the process?
>
> A.    I can't recall if at each point after each sentence or anything to that nature. I can't recall.
>
> Q.    Is it your normal practice to pause in the interview or wherever you might be in the conversation if the individual indicates in any way they do not understand?
>
> A.    Yes.  And if they don't understand or we are not understanding their -- the answer-question situation, we will -- there's a Spanish language Google translation on the Internet; we will go in there and type it in to verify this is what's being said or this is what's understanding [sic] to verify that we know what's being said.

(HT 70:23-25; 71:1-24).

As set out in the I-213 form, Agent Brabazon collected a variety of information from Mr. Munoz-Jurado.  (HT 65:2-14; 66:6-14).  Agent Brabazon also questioned Mr. Munoz-Jurado about his current mailing address.

(HT 66:15-18).  The interviewing agent always asks this question as it is

important to obtain a correct mailing address for future correspondence,

particularly in the event the interviewee is released from custody.  (HT:66:19-

25: 67:1-8).  On the I-213 form, Agent Brabazon indicated Mr. Munoz-Jurado

provided an address of "█████████████, Keystone, South Dakota,

57751."[11]  (Exhibit 2 at p. 2).  Mr. Munoz-Jurado testified he gave his P.O. Box

number to Agent Brabazon.  (HT 38:6-11).[12]

In addition, the interviewing agent must ascertain whether the

interviewee has a claim of credible fear of returning to his or her home country.

(HT 67:15-17).  ICE provides guidance and instruction to agents on how to

make this determination.  (HT 67:24-25; 68:1-2).  To ascertain whether the

interviewee has a claim of credible fear, the agent will ask the following

questions or a variation thereof:

> We don't necessarily word it as: do you fear returning to your
> country.  We will word it more in the auspices of: do you have any

---

[11]Agent Brabazon also created an I-830 form, "Notice to EOIR: Alien
Address," in which he listed Mr. Munoz-Jurado's address as █████████
█████, Keystone, South Dakota, 57751, and his telephone number as ██████
███████. (Exhibit 113).

[12]Agent Brabazon testified he did not recall Mr. Munoz-Jurado ever
mentioning a P.O. Box address until October of 2009.  (HT 86:1-15).  If
Mr. Munoz-Jurado provided that information, Agent Brabazon testified he
would have taken additional steps, including adding the information to the law
enforcement database.  (HT 86:15-21; 87:19-23).  Agent Brabazon testified he
was "known for attention to detail" and did not "miss things like that."
(HT 86:20-21).

problems in your country with anyone?  Do you have problems with
the police?  Are you scared of anybody?  Has anybody persecuted you
because of your religion?  Questions such as that.

(HT 67:18-23; see also HT 89:3-20).  On the I-213 form, Agent Brabazon stated

Mr. Munoz-Jurado "claims no fear of returning to Mexico."[13]  (Exhibit 2 at p. 2).

Mr. Munoz-Jurado testified Agent Brabazon never questioned him regarding

credible fear.  (HR 38:15-19).  Mr. Munoz-Jurado testified he would have

explained his fear of returning to Mexico given the circumstances surrounding

his mother's death, if asked.  (HT 38:20-25; 39:1-6; 39:20-24).

At the conclusion of the interview, Agent Brabazon arrested Mr. Munoz-

Jurado and then immediately released him on his own recognizance.  (HT 75:6-

10, 14-15).  Agent Brabazon gave Mr. Munoz-Jurado an I-201 form of arrest[14]

and an I-286 form for his release entitled "Notice of Custody Determination.[15]

(HT 74:13-25; 75:1-5; Exhibit 108).  On another form, an I-826 form written

primarily in Spanish, Mr. Munoz-Jurado requested a hearing before the

---

[13]Agent Brabazon confirmed he was accurate in stating Mr. Munoz-
Jurado claimed no fear of returning to Mexico.  (HT 81:15-17).

[14]Exhibit 107 is a I-200 form, "Warrant for Arrest of Alien."  It is unclear
if this was the document provided to Mr. Munoz-Jurado.

[15]Exhibit 108, the I-286 form, includes a typewritten date of June 17,
2009, which is consistent with the other documents prepared that day.  See
Exhibit 8.  However, when Mr. Munoz-Jurado signed the form, it appears he
incorrectly dated it June 15, 2009, thus causing some confusion as to when
the interview took place.  See id.; HT 37:23-25; 38:1-2.

immigration court to determine whether he could remain in the United States. (HT 40:7-19; Exhibit 110).

Additionally, Agent Brabazon personally served Mr. Munoz-Jurado with a notice to appear signed by Mr. Munoz-Jurado on June 17, 2009. (HT 75:18-25; 76:1; Exhibit 3).[16] Mr. Munoz-Jurado testified he did not understand the purpose of the notice and signed it because Agent Brabazon told him to. (HT 42:10-21). The notice provided the location of the upcoming master hearing, but did not provide the date or time. (Exhibit 3 at p. 1). The notice advised Mr. Munoz-Jurado of the nature of the master hearing, his rights regarding the hearing, and his duty to surrender for removal if he was subject to a final order of removal. (Exhibit 3 at p. 2). The notice indicated the immigration court would advise Mr. Munoz-Jurado of any relief for which he was eligible, including voluntary departure, if applicable. Id. Importantly, the notice contained this advisement:

> **Failure to appear:** You are required to provide the DHS, in writing, with your full mailing address and telephone number. You must notify the Immigration Court immediately by using Form EOIR-33 whenever you change your address or telephone number during the course of this proceeding. You will be provided with a copy of this form. Notices of hearing will be mailed to this address. If you do not submit Form EOIR-33 and do not otherwise provide an address at which you may be reached during proceedings, then the Government shall not be required to provide you with written notice of your hearing. If you fail to attend the hearing at the time and place designated on this notice, or any date and time later directed by the Immigration Court, a removal order may be made by the immigration

---

[16]Exhibit 3 is identical to Exhibit 112.

judge in your absence, and you may be arrested and detained by the DHS.

Id. (emphasis in original).

Finally, Agent Brabazon provided Mr. Munoz-Jurado with a list of free legal services, although Mr. Munoz-Jurado, like all individuals involved in administrative immigration proceedings, did not have a right to court-appointed counsel.  (HT 82:10-25; 83:1-12; Exhibit 21; see also 8 U.S.C. § 1229(b)).  Finally, Agent Brabazon provided Mr. Munoz-Jurado with an "Alien's Change of Address Form," or an EOIR-33 form.  (HT 84:23-25; 85:1-3, 19-21; Exhibit 22).  The interviewing agent provides this form to any individual who is released from ICE custody on his or her own recognizance or on bond.  (HT 85:5-7).  The interviewing agent also explains how to fill out the form and send it to the immigration court.  (HT 85:7-18).  The form contains an advisement the alien "will receive notification as to the time, date, and place of hearing or other official correspondence only at the address which you provide."  (Exhibit 22).

Mr. Munoz-Jurado was advised he was to check in with the Rapid City ICE office once a month while he waited for the master hearing.  (HT 45:4-11). Mr. Munoz-Jurado reported as directed on July 1, 2009, August 1, 2009, and September 1, 2009.  (HT 45:12-14; 58:5-10).  On July 9, 2009, the immigration court in Bloomington, Minnesota, mailed a "Notice of Hearing in Removal Proceedings" to Mr. Munoz-Jurado at ███████████████, Keystone, South

Dakota, 57751. (Exhibit 9 at p. 1). The notice informed Mr. Munoz-Jurado the master hearing was scheduled for September 24, 2009, at 10:30 a.m. Id. The United States Postal Service returned the envelope with a notation "Return to Sender/Insufficient Address/Unable to Forward." Id.

On September 24, 2009, the immigration court held the master hearing *in absentia* because Mr. Munoz-Jurado did not appear. Id. The immigration court reviewed the record, including the June 17, 2009, I-213 form, and found sufficient evidence to support removability.[17] Id. The immigration court designated Mexico as the country of removal and entered a written order *in absentia*.[18] Id. at pp. 1-2. The immigration court mailed the *in absentia* order to Mr. Munoz-Jurado's address, and the postal service returned the envelope with a notation "Return to Sender." Id. at p. 2.

When Mr. Munoz-Jurado checked in at the Rapid City ICE office on October 1, 2009, he was arrested pursuant to the September 24, 2009, removal order. (HT 45:15-17). ICE Agent Kristi L. Johnson interviewed him. (Exhibit

---

[17]The immigration court found the evidence sufficient to sustain the allegations set forth in the notice to appear and to establish removability. See Audio Recording of Master Hearing. The July 9, 2009, notice to appear is not part of the record. However, the June 17, 2009, notice to appear alleged Mr. Munoz-Jurado was not a citizen or national of the United States, was a native and citizen of Mexico, had arrived in the United States at or near Naco, Arizona, on or about June 15, 2005, and was not then admitted or paroled after inspection by immigration authorities. (Exhibit 3 at p. 1). The court presumes these same allegations appeared in the July 9, 2009, notice to appear.

[18]The *in absentia* order is Exhibit 4.

5).  Mr. Munoz-Jurado admitted he did not attend the master hearing, but explained he did not receive the notice to appear.  Id. at p. 2.  Based on this interview, Agent Johnson prepared an I-213 form, "Record of Deportable/Inadmissible Alien," dated October 1, 2009.  (Exhibit 5).  In the I-213 form, Agent Johnson indicated Mr. Munoz-Jurado "claims no fear of returning to Mexico."  Id. at p. 2.  Mr. Munoz-Jurado testified Agent Johnson did not speak to him in Spanish and did not ask him if he feared returning to Mexico.[19]  (HT 46:1-9).  Mr. Munoz-Jurado testified he would have expressed his fear of returning to Mexico, if asked.  (HT 46:10-12).  Agent Johnson provided Mr. Munoz-Jurado with a copy of the September 24, 2009, removal order and the National Detainee Handbook.  (Exhibit 5 at p. 3 & Exhibit 18).  Mr. Munoz-Jurado was denied bond.[20]  (Exhibit 5 at p. 3).

---

[19]Agent Brabazon did not recall if he was present at the October 1, 2009, interview.  (HT 73:10-13).  However, it is the policy of his office for two agents to be present at an interview.  (HT 73:14-20).  If one agent is not proficient in Spanish, another agent who is proficient in Spanish is always present during an interview.  (HT 73:21-23).  Like Agent Brabazon, Agent Johnson received training on the importance of determining whether an interviewee had a claim of credible fear and of obtaining the interviewee's correct mailing address.  (HT 73:24-25; 74:1-12).  At the time of the interview, Agent Johnson had two years of experience as an ICE agent.  (HT 80:20-25; 81:1).  Agent Brabazon testified he believed all of the information in the October 1, 2009, I-213 form was accurate.  (HT 81:2-3).

[20]Agent Johnson designated Mr. Munoz-Jurado for transfer to the Minnehaha County Jail in Sioux Falls, South Dakota.  (Docket 117).  It appears he went to the Minnehaha County Jail briefly.  See HT 46:19-25; 47:1-6.  It appears on or about October 8, 2009, Mr. Munoz-Jurado was taken to Worthington, Minnesota.  See HT 47:7-8, 19-22; Exhibit 6 at pp. 8 & 10.

Shortly thereafter, on October 8, 2009, attorney Megan Tomjack submitted a notice of appearance, or an EOIR-33 form, on behalf of Mr. Munoz-Jurado.  (Exhibit 6 at pp. 3-4).  Ms. Tomjack moved the immigration court to reopen removal proceedings and rescind the *in absentia* order on the basis Mr. Munoz-Jurado did not receive notice of the master hearing.  Id. at pp. 4-5.  In support,   Mr. Munoz-Jurado submitted an affidavit in which he asserted "he may have a claim to voluntary departure or cancellation."[21]  Id. at p. 8.  Mr. Munoz-Jurado also stated he lived at ███ █████████████ in Keystone, South Dakota, but "[b]ecause Keystone is [a] town that is active during the summer and essentially closed during the winter the majority of its residence [sic] use a post office box address."  Id.  Henry K. Evans, an attorney in the same firm as Ms. Tomjack, submitted an affidavit in which he stated, "his office has difficulties in mailing documents to rural South Dakota and that the USCIS has had problems mailing documents to your Affiant's Firm's clients in rural South Dakota. . . . Keystone, South Dakota is a seasonal tourist town that host [sic] Mount Rushmore and is populated during the summer, and becomes a ghost town during the off-season."[22]  Id. at p. 9. The United States Department of Homeland Security ("DHS") opposed the motion.  (Exhibit 7).

---

[21]Mr. Munoz-Jurado signed the affidavit on October 8, 2009, in Worthington, Minnesota.  (Exhibit 6 at p. 8).

[22]In his affidavit, Mr. Evans stated his firm was retained on October 7, 2009, to represent Mr. Munoz-Jurado and he and Ms. Tomjack met with Mr. Munoz-Jurado in Worthington, Minnesota.  (Exhibit 6 at p. 10).

On November 2, 2009, the immigration court entered a memorandum and order denying Mr. Munoz-Jurado's motion. (Exhibit 9). In reaching its decision, the court reasoned as follows:

> Respondent states in his motion that the town in which he lives, Keystone, South Dakota, is a busy tourist town during the summer, but that it is essentially closed during the winter. Presumably, Respondent makes this contention in order to argue that mail delivery is difficult during the winter months. However, the Notice of Hearing was sent on July 9, 2009, clearly during the middle of summer. Furthermore, the Notice of Hearing was sent to the most recent address provided by Respondent, thus fulfilling the delivery requirements of section 240(b)(5) of the Act. Therefore, respondent has not stated a valid claim to warrant reopening of this proceeding.

Id. at p. 2. The immigration court provided written notice of its decision to Mr. Munoz-Jurado by mailing a copy of the decision and a cover letter to Ms. Tomjack. (Exhibit 8). On the cover sheet, the immigration court checked the space next to the following text:

> Attached is a copy of the written decision of the Immigration Judge. This decision is final unless an appeal is taken to the Board of Immigration Appeals. The enclosed copies of FORM EOIR 26, Notice of Appeal, and FORM EOIR 27, Notice of Entry as Attorney or Representative, properly executed, must be filed with the Board of Immigration Appeals on or before 12-2-09. The appeal must be accompanied by proof of paid fee ($110.00).

Id. Mr. Munoz-Jurado did not appeal to the Board of Immigration Appeals.[23]

On December 10, 2009, after the deadline for filing an appeal expired, the United States Immigration and Naturalization Service ("INS") issued an

---

[23]The court contacted the Board of Immigration Appeals and discovered the system did not contain any information regarding an appeal on behalf of Mr. Munoz-Jurado.

I-205 form, "Warrant of Removal/Deportation." (Exhibit 10). INS removed Mr. Munoz-Jurado to Mexico on December 9, 2009, from Hidalgo, Texas. Id. at p. 2. INS provided Mr. Munoz-Jurado with an I-294 form, "Warning to Alien Removed or Deported." Id. at p. 3. The form indicated Mr. Munoz-Jurado was prohibited from entering, attempting to enter, or being in the United States for a period of ten years from the date of removal. Id. The form indicated he must obtain permission from the Attorney General to reapply for admission to the United States within the ten year period. Id. The form also warned Mr. Munoz-Jurado he could be subject to a felony conviction if he entered, attempted to enter, or was found in the United States without permission and set out the penalties upon conviction. Id.

On August 7, 2011, Mr. Munoz-Jurado entered the United States at or near Brownsville, Texas, without inspection or parole by the immigration authorities or permission of the Attorney General or Secretary of Homeland Security. (Exhibit 13 at p. 2). On or about August 28, 2011, the Pennington County Sheriff's Office arrested Mr. Munoz-Jurado for driving under the influence ("DUI") and transported him to the Pennington County Jail. Id. A fingerprint analysis and record check revealed an order of removal and a removal to Mexico was entered in Mr. Munoz-Jurado's case. Id.

On September 7, 2011, the government indicted Mr. Munoz-Jurado on one count of illegal reentry after deportation, in violation of 8 U.S.C. § 1326(a).

(Docket 1).  On September 15, 2011, after resolution of the state DUI charge,

ICE took custody of Mr. Munoz-Jurado.  (Exhibit 13 at p. 2).

ICE Agent Michael Livingston interviewed Mr. Munoz-Jurado on

September 15, 2011, at the Rapid City ICE office.[24]  Id.; HT 48:7-12.  At the

start of the interview, Agent Livingston advised Mr. Munoz-Jurado of his

Miranda[25] rights.  (Exhibit 13[26] at p. 2 & Exhibit 14[27] at pp. 1-2).  Mr. Munoz-

Jurado waived his rights and provided a sworn statement in answer to

numerous questions.[28]  (Exhibit 14 at pp. 3-5.)  Mr. Munoz-Jurado admitted to

being an illegal alien.  Id. at p. 4.  In response to the question, "Is there

anything else you would like to add?" Mr. Munoz-Jurado provided the following

answer:

> I came back here because I have a problem in my country because
> the La Familia cartel killed and raped my mother and I fear they will
> kill me as well.  My wife and children are here in Keystone and I want

---

[24]Mr. Munoz-Jurado testified Agent Livingston did not know any Spanish
and did not conduct the interview in Spanish.  (HT 50:8-10).  Agent Brabazon
was also present during the interview.  (HT 72:22-25).  Like Agent Brabazon,
Agent Livingston received training on the importance of determining whether
an interviewee had a claim of credible fear and of obtaining the interviewee's
correct mailing address.  (HT 73:24-25; 74:1-12).

[25]Miranda v. Arizona, 384 U.S. 436 (1966).

[26]Exhibit 13 is identical to Exhibit 119.

[27]Exhibit 14 is identical to Exhibit 121.

[28]The affidavit is an I-215B form.  (Exhibit 14).  It is a full interview of
Mr. Munoz-Jurado and is more substantive than an I-213 form.  (HT 78:23-25;
79:1-7).

to be with them where it is safe.  I don't want to go back to Mexico
because of the problem with the cartel and because I have all my
children here.  All my children are born here in the United States and
I don't want them to grow up without a father.

Id. at p. 5.  From the information provided by Mr. Munoz-Jurado in his sworn

statement, Agent Livingston updated an I-213 form, "Record of

Deportable/Inadmissible Alien."[29]  (Exhibit 13).  Agent Livingston provided

Mr. Munoz-Jurado with a copy of the National Detainee Handbook.  Id.; Exhibit

123.  Agent Livingston ordered Mr. Munoz-Jurado detained at the Pennington

County Jail pending further proceedings.  (Exhibit 124).

Agent Livingston also produced an I-871 form, "Notice of Intent/Decision

to Reinstate Prior Order."  (Exhibit 122).  He made an initial finding

Mr. Munoz-Jurado was an alien who illegally reentered the United States after

deportation and was subject to removal by reinstatement of the prior removal

order.  Id.  Mr. Munoz-Jurado checked the box indicating he did "not wish to

---

[29]Agent Livingston began the I-213 form on August 28, 2011, before
interviewing Mr. Munoz-Jurado.  (HT 78:23; Exhibit 13).  Once Agent
Livingston interviewed Mr. Munoz-Jurado, he "carried over" information from
the interview to the I-213 form.  (HT 80:1-3).  However, Agent Livingston failed
to carry over Mr. Munoz-Jurado's claim of credible fear.  (HT 79:23-25; 80:1-
10).  Agent Brabazon clarified the I-231 form is in error with respect to the
statement Mr. Munoz-Jurado "claims no fear of returning to Mexico."  (HT
79:20-21; Exhibit 13 at p. 3).  Agent Brabazon explained, at the time of the
interview, Agent Livingston was a new agent and was just learning the process
of ICE's systems.  (HT 80:13-15).  Agent Livingston "had a tendency to kind of
regurgitate information that he would see on a previous I-213 without
understanding that if the answers were different, you have to change them."
(HT 80:16-19).

make a statement contesting this determination."[30]  Id.  Because Mr. Munoz-

Jurado did not contest the determination, an authorized official made a final

finding Mr. Munoz-Jurado was subject to removal and reinstated the prior

removal order.  Id.  Mr. Munoz-Jurado testified he did not understand what he

did when he signed the I-871 form and checked the box.  (HT 51:21-25; 52:1-

2).  Mr. Munoz-Jurado testified he thought, by signing this and other forms on

September 15, 2011, he would have the opportunity to appear before the

immigration court.  (HT 51:12-15).

On September 19, 2011, Mr. Munoz-Jurado made his initial appearance

on the indictment.  (Docket 3).  On October 26, 2011, Mr. Munoz-Jurado

moved to dismiss the indictment by collaterally attacking the deportation

proceedings.  (Docket 18).  The court shall address the motion in greater detail

below.

## DISCUSSION

Mr. Munoz-Jurado argues the September 24, 2009, removal order of the

immigration court, entered *in absentia*, see Exhibit 4, "cannot serve as a

predicate for a prosecution for illegal reentry" because the order "was

---

[30]Mr. Munoz-Jurado did not have the right to a hearing before the
immigration court to contest the determination he was an alien who illegally
reentered the United States after deportation and was subject to removal.
Briones-Sanchez v. Heinauer, 319 F.3d 324, 327 (8th Cir. 2003).  Mr. Munoz-
Jurado only had the right to written notice and an opportunity to make a
statement contesting the determination.  Id.  The I-871 form contained an
acknowledgment "[t]he facts that formed the basis of this determination, and
the existence of the right to make a written or oral statement contesting this
determination, were communicated to the alien in the Spanish language."
(Exhibit 122).  The court does not know if this communication occurred.

fundamentally unfair." (Docket 19 at p. 1).  Because he did not receive actual notice of the September 24, 2009, master hearing, Mr. Munoz-Jurado alleges he suffered prejudice in that he was not advised of his eligibility for voluntary departure and withholding of removal.  Id.  The court shall address each argument in turn, but first provides an overview of relevant case law.

It is a federal crime for an alien to reenter the United States illegally after deportation.  8 U.S.C. § 1326.  In an illegal reentry prosecution, the government must prove the alien was deported from the United States "while an order of exclusion, deportation, or removal is outstanding."  8 U.S.C. § 1326(a)(1); <u>United States v. Mendez-Morales</u>, 384 F.3d 927, 929 (8th Cir. 2004).

"Because an original deportation order is a condition precedent to the operation of § 1326," <u>United States v. Arita-Campos</u>, 607 F.3d 487, 490 (7th Cir. 2010), an alien in a criminal proceeding charged under § 1326 may collaterally attack a deportation order under certain limited circumstances enumerated in subsection (d) of § 1326.  <u>United States v. Rodriguez</u>, 420 F.3d 831, 833 (8th Cir. 2005).  Subsection (d) is a codification of the holding of the United States Supreme Court in <u>United States v. Mendoza-Lopez</u>, 481 U.S. 828 (1987), "which established due process requirements for the application of § 1326." <u>Rodriguez</u>, 420 F.3d at 831.  Section § 1326(d) provides as follows:

> In a criminal proceeding under this section, an alien may not challenge the validity of the deportation order . . . unless the alien demonstrates that--
>
> > (1)    the alien exhausted any administrative remedies that may have been available to seek relief against the order;

(2)     the deportation proceedings at which the order was issued improperly deprived the alien of the opportunity for judicial review; and

(3)     the entry of the order was fundamentally unfair.

8 U.S.C. § 1326(d).  The United States Court of Appeals for the Eighth Circuit construes Mendoza-Lopez as a two-step process, consistent with § 1326(d), "as barring use of a prior deportation order in a § 1326 prosecution when '(1) an error in the deportation proceedings rendered the proceedings fundamentally unfair in violation of due process, *and* (2) the error functionally deprived the alien of the right to judicial review.' " Mendez-Morales, 384 F.3d at 929 (emphasis in original) (quoting United States v. Torres-Sanchez, 68 F.3d 227, 230 (8th Cir. 1995)).  With respect to the first step in the two-step process, "the establishment of a fundamentally unfair hearing in violation of due process requires a showing both of a fundamental procedural error and that the error caused prejudice; an error cannot render a proceeding fundamentally unfair unless that error resulted in prejudice." Torres-Sanchez, 68 F.3d at 230.  "Actual prejudice exists where defects in the deportation proceedings 'may well have resulted in a deportation that would not otherwise have occurred.' " Id. (quoting United States v. Santos-Vanegas, 878 F.2d 247, 251 (8th Cir. 1989)); see also Mendez-Morales, 384 F.3d 927, 631-32 (defining prejudice as "a reasonable likelihood that but for the errors complained of the defendant would not have been deported") (citation and internal quotation

20

marks omitted).  Mr. Munoz-Jurado bears the burden of proof in his collateral attack.  <u>United States v. Martinez-Amaya</u>, 67 F.3d 678, 681-82 (8th Cir. 1995).

## A.    Whether Mr. Munoz-Jurado Exhausted Administrative Remedies

As a preliminary matter, the court finds Mr. Munoz-Jurado did not satisfy the first requirement of § 1326(d), exhaustion of administrative remedies.  <u>See</u> 8 U.S.C. § 1326(d)(1).  "To satisfy the exhaustion prong of § 1326, an alien must have filed a motion to reopen, appealed to the Board of Immigration Appeals, and pursued all other administrative remedies available to him."  <u>Arita-Campos</u>, 607 F.3d at 491.  Although Mr. Munoz-Jurado, through counsel, moved to reopen the deportation proceedings and rescind the *in absentia* removal order, he did not appeal the immigration court's denial of his motion to the Board of Immigration Appeals.  Mr. Munoz-Jurado alleged he was "deprived of an opportunity for judicial review" because he "was never advised of his right to appeal."  (Docket 19 at p. 13).  However, the immigration court informed Mr. Munoz-Jurado of his right to appeal and the deadline for doing so by mailing a cover sheet and the appropriate forms to Mr. Munoz-Jurado's counsel.[31]  (Exhibit 8).

It is unclear whether, in this circuit, failure to exhaust administrative remedies is a prerequisite to a collateral challenge to deportation

---

[31]Mr. Munoz-Jurado testified he was never told of his right to appeal.  (HT 54:3-12).  Assuming *arguendo* his counsel failed to explain this right to him, no blame can be imputed to the government, the immigration court, or INS.

proceedings under § 1326(d).[32]  It does not appear the Eighth Circuit has

weighed in on the issue; however, numerous courts in other circuits have held

"because the three requirements of [1326(d)] are stated in the conjunctive, a

defendant must satisfy all three prongs to prevail in his collateral attack."

Arita-Campos, 607 F.3d at 491 (collecting cases); but see United States v.

Muro-Inclan, 249 F.3d 1180, 1183 (9th Cir. 2001) (holding the exhaustion

requirement of § 1326(d) "cannot bar collateral review of a deportation

proceeding when the waiver of right to an administrative appeal did not

comport with due process").  At least one district court within the Eighth

Circuit held a defendant must establish all three prongs of § 1326(d) to prevail

in a collateral challenge to deportation proceedings.  See United States v.

Aragon-Ruiz, 551 F. Supp. 2d 904, 918-19 (D. Minn. 2008) (citing United

States v. Fernandez-Antonia, 278 F.3d 150, 157 (2d Cir. 2002)).  In the interest

of completeness, the court will move beyond the exhaustion issue to address

the merits of Mr. Munoz-Jurado's claims.

---

[32]Exhaustion of administrative remedies and issue exhaustion are
prerequisites to direct review by the Eighth Circuit of an order of the Board of
Immigration Appeals.  Rodriguez-Cuate v. Gonzales, 444 F.3d 1015, 1019 (8th
Cir. 2006); Etchu-Njang v. Gonzales, 403 F.3d 577, 582-85 (8th Cir. 2005).

**B.** **Whether the September 24, 2009, Master Hearing, Held *In Absentia*, was Fundamentally Unfair**

      **1.** **Notice of the September 24, 2009, Master Hearing**

Mr. Munoz-Jurado alleges the deportation proceedings were fundamentally unfair. (Docket 19 at p. 1). Mr. Munoz-Jurado bears the burden of demonstrating the proceedings contained a fundamental procedural error so as to render them fundamentally unfair. Martinez-Amaya, 67 F.3d at 681-82; Torres-Sanchez, 68 F.3d at 230. The error alleged by Mr. Munoz-Jurado is his lack of actual notice of the master hearing.[33] (Docket 19 at pp. 5-6).

---

[33]The immigration court may only remove an alien *in absentia* if there is "clear, unequivocal, and convincing evidence" the proper written notice of the hearing was given and the alien is removable. 8 U.S.C. § 1229a(b)(5)(A); see also Kasyupa v. Keisler, 252 Fed. Appx. 106, 108 (8th Cir. 2007) ("An [immigration judge] can order removal of an alien *in absentia* if the alien is shown to be removable by clear, unequivocal, and convincing evidence, the notice sent to the alien complied with the statutory requirements for notice, and the alien failed to appear."). Mr. Munoz-Jurado does not allege the immigration court erred in finding sufficient evidence to sustain the allegations in the notice to appear and to support removability. See generally Dockets 19 & 67. In any event, the court reviewed the audio-recording of the master hearing and the full record before the immigration court and finds clear, unequivocal, and convincing evidence to sustain the allegations in the notice to appear, accord Exhibit 3, and to support removability. The immigration court noted some of the forms listed Mr. Munoz-Jurado's date of return to the United States through Naco, Arizona, as May 16, 2009, or as June 15, 2005. The correct date is June 15, 2005. The immigration court found Mr. Munoz-Jurado was removable as charged regardless of whether he entered the United States in 2005 or 2009.

The INS regulations pertaining to the inspection, apprehension, examination, exclusion, and removal of aliens are codified in 8 U.S.C. § 1221 *et seq.* Pursuant to INS regulations, the immigration court must send written notice of removal proceedings (a "Notice to Appear") and of any change in the time and place of the proceedings to an alien either (1) in person or (2) "if personal service is not practicable, through service by mail to the alien or to the alien's counsel of record, if any."[34] 8 U.S.C. § 1229(a)(1) & (2). Service by mail "shall be sufficient if there is proof of attempted delivery to the last address provided by the alien . . . ." 8 U.S.C. § 1229(c). An immigration court may remove an alien *in absentia* if it provided proper written notice under § 1229(a)(1) or (2) to the alien or the alien's counsel of record. 8 U.S.C. § 1229a(b)(5)(A). "Although aliens are protected by the constitutional guarantee of due process, . . . due process requires only notice that is reasonably calculated to reach the alien. . . . Thus, if the notice sent to the alien complied with 8 U.S.C. § 1229, there is no due process violation even if the alien did not receive actual notice of the hearing." Kasyupa, 252 Fed. Appx. at 109.

_____

[34]Prior to the enactment of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 ("IIRIRA"), immigration officials were required to provide written notice to an alien in person or by certified mail. Rodriguez-Cuate, 444 F.3d at 1017. The transitional rules of the IIRIRA do not apply to Mr. Munoz-Jurado's case given the timing of his deportation proceedings. See id. at 1016, n. 2.

On July 9, 2009, the immigration court sent Mr. Munoz-Jurado a "Notice of Hearing in Removal Proceedings" setting forth the time and place of the September 24, 2009, master hearing. (Exhibit 9 at p. 1). The immigration court mailed the notice to the address provided by Mr. Munoz-Jurado. Id. The court finds the failure to provide a complete mailing address lies not with the immigration court, ICE, or DHS, but rather with Mr. Munoz-Jurado. Mr. Munoz-Jurado clearly understood the importance of providing his P.O. Box number to immigration officials. Nowhere in the record does it indicate he did so until he raised the issue in his motion to reopen. Every document that contained his address listed it as ███████████, Keystone, South Dakota, 57751.[35] Mr. Munoz-Jurado reviewed these documents and was given copies of some documents. At some point, Mr. Munoz-Jurado should have realized immigration authorities did not have his P.O. Box number. It was Mr. Munoz-Jurado's obligation to provide a complete mailing address. See Kasyupa, 252 Fed. Appx. at 108.

The court does not find credible Mr. Munoz-Jurado's assertion he provided his P.O. Box number to Agent Brabazon. Agent Brabazon is an

---

[35]In contrast, immigration documents pertaining to Ms. Hernandez-Garcia included her P.O. Box number. (Exhibits 11, 12, 101-104, & 106). ICE obtained this information by using a database called Accurint which is available to law enforcement and credit bureaus. (HT 63:1-18). This database provided ICE with Ms. Hernandez-Garcia's P.O. Box number. (HT 63:25; 64:1-3). ICE obtained access to Accurint in December of 2010, after Mr. Munoz-Jurado was deported. (HT 87:2-8).

experienced agent and a supervisor. He understands the importance of collecting an accurate and complete mailing address. Agent Brabazon did not recall if Mr. Munoz-Jurado provided his P.O. Box number, but if he had, Agent Brabazon would have taken additional steps to ensure a proper record. Further, Agent Brabazon is satisfactory in Spanish. Assuming Mr. Munoz-Jurado spoke no English in 2009, the court believes Agent Brabazon knew enough Spanish to interpret a P.O. Box number if Mr. Munoz-Jurado provided one. Assuming *arguendo* Mr. Munoz-Jurado attempted to provide a P.O. Box number to Agent Brabazon and Agent Brabazon did not understand and, thus, did not include the information, Mr. Munoz-Jurado had ample opportunity to correct the error. Agent Brabazon gave Mr. Munoz-Jurado an EOIR-33 form, "Alien's Change of Address Form/Immigration Court." (Exhibit 22).

Mr. Munoz-Jurado could have filled out the form or obtained assistance in filling out the form. He could have attempted to provide his P.O. Box number when he reported to the Rapid City ICE office on July 1, 2009, August 1, 2009, and September 1, 2009. He could have asked a friend or relative to assist him. Other than at the time of the motion to reopen, there is no evidence Mr. Munoz-Jurado attempted, however unsuccessfully, to convey his complete address at any stage beyond the June 17, 2009, interview, assuming *arguendo* he made an attempt then. In short, "[i]t was not beyond [Mr. Munoz-Jurado's] control that his [complete] address was not on file." See Kasypus, 252 Fed. Appx. at 108.

The court also notes Mr. Munoz-Jurado's motion to reopen and affidavit did not include any reference to his attempt to provide Agent Brabazon with his P.O. Box number. (Exhibit 6). Mr. Munoz-Jurado personally met with his counsel before filing the motion to reopen, and his counsel spoke with Agent Brabazon. Id. at p. 10. The court finds it surprising Mr. Munoz-Jurado did not inform counsel of his alleged attempt to provide his P.O. Box number to Agent Brabazon, particularly given the nature and purpose of the motion. If Mr. Munoz-Jurado so informed counsel, the court is hard-pressed to believe counsel would not have included this information in the motion or in the supporting affidavits.

The court finds the immigration court complied with the notice requirements of INS regulations.[36] The court finds the immigration court's decision to hold the master hearing *in absentia* was not a fundamental procedural error, did not render the proceedings fundamentally unfair, and did not violate Mr. Munoz-Jurado's right to due process. In reaching this decision, the court takes into consideration the immigration court's analysis of the notice issue. In ruling on Mr. Munoz-Jurado's motion to reopen, the immigration court reviewed the applicable INS regulations and all of the information

---

[36]Mr. Munoz-Jurado implies the immigration court had his telephone number and should have called him to advise of the hearing date. (HT 10:4-6; 44:24-25; 45:1-3). However, the immigration court has no obligation to provide telephonic notice.

shedding light on the notice issue and ultimately found notice was proper. This court concurs.

Because the notice was proper and the *in absentia* hearing was fair, the court need not inquire further. However, in the interest of completeness, the court next turns to the issue of whether Mr. Munoz-Jurado suffered prejudice. Mr. Munoz-Jurado argues he primarily suffered prejudice because the immigration court did not inform him of his eligibility for voluntary departure and withholding of removal.[37] (Docket 19 at pp. 6-12). The court shall address each allegation in turn.

---

[37]Mr. Munoz-Jurado points to inconsistencies or errors in the immigration documents. (Docket 67 at pp. 4-7). As set out in this opinion, the court finds many of the "errors" alleged were not errors. For example, the court found ICE agents did not err in listing Mr. Munoz-Jurado's address without his P.O. Box number because they did not know this information and Mr. Munoz-Jurado failed to provide it. However, there are some inconsistencies in the record. The court finds these inconsistencies are not significant to the analysis because they either are minor or occurred after the 2009 deportation proceedings.

Mr. Munoz-Jurado also alleged prejudice because he was not informed of his right to court-appointed counsel, he is now facing criminal prosecution, and he will be deported without an opportunity to seek withholding of removal. (HT 13:2-3; 17:2-23). However, as explained previously, Mr. Munoz-Jurado was not entitled to court-appointed counsel. Additionally, Mr. Munoz-Jurado is facing criminal prosecution partly because of his decision to return to United States after being warned of the penalties for doing so. See Exhibit 10 at p. 3. Finally, Agent Brabazon testified an immigration officer will interview Mr. Munoz-Jurado regarding his claim of credible fear if he makes such a claim when he is returned to ICE custody at the conclusion of the criminal proceedings. (HT 81:18-25; 82:1-9).

## 2. Eligibility for Voluntary Departure

Voluntary deportation "is a form of relief that is available only in the Attorney General's discretion." <u>Garcia-Mateo v. Keisler</u>, 503 F.3d 698, 700 (8th Cir. 2007). Mr. Munoz-Jurado argues the immigration court's failure to advise him of his eligibility for voluntary departure violated his right to due process and resulted in prejudice.[38] (Docket 19 at pp.6-9). Mr. Munoz-Jurado cites exclusively to decisions issued by the United States Court of Appeals for the Ninth Circuit. <u>See id.</u> The Ninth Circuit expresses a minority view. "[A] majority of circuits have rejected the proposition that there is a constitutional right to be informed of eligibility for–or to be considered for–discretionary relief." <u>United States v. Santiago-Ochoa</u>, 447 F.3d 1015, 1020 (7th Cir. 2006) (collecting cases and joining in the majority view); <u>see also</u> <u>United States v. Aguirre-Tello</u>, 353 F.3d 1199, 1205 (10th Cir. 2004) ("We agree with the majority of other circuits which have addressed the issue and concluded that there is no constitutional right to be informed of the existence of discretionary

---

[38]In its opposition brief, the government argued Mr. Munoz-Jurado was ineligible for voluntary departure because he had been afforded this relief on June 15, 2005. (Docket 30 at pp. 3-4). However, at the evidentiary hearing, the government indicated it made a mistake. (HT 6:20-21). On June 15, 2005, immigration authorities allowed Mr. Munoz-Jurado to *voluntarily return* to Mexico. A voluntary return is not a voluntary departure. (HT 7:1-3). An alien is eligible only once for a voluntary departure, which is court ordered. (HT 7:6-7). <u>See</u> 8 U.S.C. § 1229(c). Mr. Munoz-Jurado never voluntarily departed to Mexico. (HT 7:12-13). Agent Brabazon confirmed the above information. (HT 84:17-22).

relief for which a potential deportee might be eligible.") (collecting cases); accord Garcia-Mateo, 503 F.3d at 700 ("Because [the alien] has no constitutionally protected liberty or property interest in the discretionary relief of voluntary departure[,] . . . she cannot establish that she had a right to due process in the proceedings to obtain this relief.").

Mr. Munoz-Jurado's case is similar to Arita-Campos. In Arita-Campos, the government indicted the defendant under § 1326(a). 607 F.3d at 489. The defendant collaterally attacked the underlying deportation order on the basis he did not receive actual notice of the removal hearing held *in absentia*. Id. at 490. In relevant part, the defendant argued the immigration court violated his right to due process because he was not informed of the hearing and was unable to seek voluntary departure. Id. at 493. The United States Court of Appeals for the Seventh Circuit rejected defendant's argument. Id. The Seventh Circuit held "[t]he unavailability of discretionary relief does not amount to a deprivation of due process. . . . [T]he majority of circuits, including our own, have held that due process does not [even] encompass a right to be informed of eligibility for–or to be considered for–discretionary relief." Id. (citations and internal quotation marks omitted).

The court finds the majority view persuasive.  Accordingly, the fact Mr. Munoz-Jurado was not informed of the existence of voluntary departure did not violate due process because it is a discretionary form of relief.[39]

### 3.    Eligibility for Withholding of Removal

Unlike voluntary departure, withholding of removal "is a mandatory form of relief."  Karim v. Holder, 596 F.3d 893, 897 (8th Cir. 2010).  "To obtain withholding of removal, an alien must demonstrate a clear probability–i.e., that it is more likely than not–that he would suffer persecution on account of a protected ground."  Id.; see also 8 U.S.C. § 1231(b)(3)(A) ("[T]he Attorney General may not remove an alien to a country if the Attorney General decides that the alien's life or freedom would be threatened in that country because of the alien's race, religion, nationality, membership in a particular social group, or political opinion.").

---

[39]The court finds it noteworthy the June 17, 2009, notice to appear contained the following advisement:

> You will be advised by the immigration judge before whom you appear of any relief from removal for which you may appear eligible including the privilege of departure voluntarily.  You will be given a reasonable opportunity to make any such application to the immigration judge.

(Exhibit 3 at p. 2).  This notice to appear certainly apprised Mr. Munoz-Jurado of the existence of voluntary departure as a form of relief.  Further, Mr. Munoz-Jurado raised the issue in his motion to reopen by alleging "he may have a claim to a voluntary departure or cancellation."  See Exhibit 6 at p. 8.  Thus, he knew of the existence of voluntary departure and had an opportunity to be heard.

Mr. Munoz-Jurado argues he was eligible for withholding of removal because of his "legitimate fear of return[ing] to Mexico" due to the activities of the La Familia cartel. (Docket 19 at pp. 11-12). However, the only information before the immigration court at the September 24, 2009, master hearing was that Mr. Munoz-Jurado had no fear of returning to Mexico. This information came from the I-213 form dated June 17, 2009, which Agent Brabazon produced after interviewing Mr. Munoz-Jurado. (Exhibit 2). The court finds credible Agent Brabazon's assertion Mr. Munoz-Jurado did not express fear of returning to Mexico. Agent Brabazon is an experienced agent trained in ascertaining whether an alien has a claim of credible fear. Agent Brabazon is satisfactory in Spanish. If, in his answers to Agent Brabazon's questions, Mr. Munoz-Jurado indicated in any way he feared returning to Mexico, the court believes Agent Brabazon would have included the information.[40] There is no benefit to Agent Brabazon to not include the information.

The first time Mr. Munoz-Jurado expressed fear of returning to Mexico was in his affidavit dated September 15, 2011, approximately two years after the immigration court issued its removal order. (Docket 14 at p. 3). Mr. Munoz-Jurado had multiple opportunities to assert a claim of credible fear. See HT 77:1-25; 78:1-8. Of significance is the fact Mr. Munoz-Jurado did not

---

[40]Mr. Munoz-Jurado was not provided a "credible fear worksheet" because he expressed no fear in returning to Mexico. (Exhibit 3 at p.2).

make such a claim in his motion to reopen, although he asserted a claim for voluntary departure or cancellation. This omission is particularly puzzling because Mr. Munoz-Jurado had the benefit of counsel. Mr. Munoz-Jurado claims his family told his counsel he feared to return to Mexico and described the circumstances surrounding his mother's death, but his counsel failed to raise the issue. (HT 9:19-25). The court does not find this assertion credible. There is no reason why counsel would raise the issue of voluntary departure, but not raise the issue of withholding of removal. Given the state of the record before the immigration court on September 24, 2009, Mr. Munoz-Jurado would not have been eligible for withholding of removal.[41] Accordingly, the fact Mr. Munoz-Jurado was not informed of the existence of withholding of removal did not violate due process.

**C.    Whether the Error Alleged Deprived Mr. Munoz-Jurado of his Right to Judicial Review**

"Where a determination made in an administrative proceeding is to play a critical role in the subsequent imposition of a criminal sanction, there must be some meaningful review of the administrative proceeding." Mendoza-Lopez, 481 U.S. at 837-38. "This principle means at the very least that where the

---

[41]Even if Mr. Munoz-Jurado informed the immigration court of the circumstances surrounding his mother's death, the court finds it unlikely he would have been eligible for withholding of removal. Mr. Munoz-Jurado was not persecuted on a protected ground, that is, because of his race, religion, nationality, membership in a particular social group, or political opinion. See 8 U.S.C. § 1231(b)(3)(A). Rather, the Mexican mafia committed a crime against his mother in an attempt to extort money because they believed his family was wealthy.

defects in an administrative proceeding foreclose judicial review of that proceeding, an alternative means of obtaining judicial review must be made available before the administrative order may be used to establish conclusively an element of a criminal offense." Id. at 838.

Assuming *arguedo* the immigration court erred in holding the master hearing *in absentia*, any error was cured by the immigration court's notice to Mr. Munoz-Jurado, through his counsel, of the right to appeal to the Board of Immigration Appeals. If Mr. Munoz-Jurado appealed to the Board of Immigration Appeals and was unsuccessful, he had recourse to appeal to the Eighth Circuit. Accordingly, the court finds Mr. Munoz-Jurado was not deprived of the opportunity for judicial review.

### CONCLUSION

The court finds the September 24, 2009, removal hearing and deportation order, entered *in absentia*, did not violate Mr. Munoz-Jurado's due process rights. Mr. Munoz-Jurado's collateral challenge to the deportation proceedings underlying the present prosecution must fail. In accord with the above discussion, it is hereby

ORDERED that Mr. Munoz-Jurado's first motion to dismiss the indictment (Docket 18) is denied.

Dated February 27, 2012.

BY THE COURT:

/s/ *Jeffrey L. Viken*
JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE